UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 06-20737-CIV-KING

EDWARD OWAKI,

     Plaintiff,

v.

CITY OF MIAMI, a political subdivision of
the state of Florida, MIAMI POLICE OFFICER
DARIAN WILLIAMS, Individually, MIAMI POLICE
MAJOR ADAM BURDEN, Individually,
MIAMI POLICE LT MARILYN GONZALEZ, Individually,
MIAMI POLICE SERGEANT DAWN CAMPBELL, Individually,
and MIAMI POLICE OFFICER JOHN DOE NO. 1, Individually.

     Defendants.

_____/

## ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT

THIS CAUSE is before the Court upon the filing of three (3) separate motions for

summary judgment on the last day of the deadline for pleading, March 12, 2007, on

behalf of the Defendant City of Miami (D.E. #64) and five (5) individual Defendant

police officers Williams, Burden, Gonzalez, Campbell and John Doe No. 1, (D.E. #65

and 66).[1] These motions have been fully briefed and were orally argued at the final

_____

[1] A Rule 16 Scheduling Conference was conducted on June 14, 2006, at which time a
final pretrial conference was scheduled for May 11, 2007, with discovery deadlines of March 7,
2007 and pleading practice deadline of March 12, 2007. At the time of the entry of the
scheduling order on June 14, 2006, the case had been pending since its original filing on
November 17, 2005 and its removal to this Court on March 23, 2006 for approximately seven (7)

1

pretrial conference conducted May 11, 2007, after the completion of all discovery and motion practice.

The United States District Court has jurisdiction over this removed action pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1331, and 28 U.S.C. § 1343. The parties have stipulated in their Joint Pretrial Stipulation filed May 4, 2007 (D.E. #142) that the claims raised by Plaintiff Edward Owaki in his Second Amended Complaint (D.E. #28)[2] and the separate Answers filed thereto by the City and the individual Defendants (D.E. #s 34, 35, 36, 37 and 57) address the following agreed issues:

> "This is a claim by Plaintiff, OWAKI, against the Defendants, CITY, OFF. WILLIAMS, SGT. CAMPBELL, LT. GONZALEZ, and MAG. BURDEN for alleged violations of civil rights, false arrest and battery. EDWARD OWAKI claims that he was arrested by OFF. WILLIAMS and SGT. CAMPBELL without probable cause and that excessive force was used during his apprehension. OWAKI claims that Supervisors SGT. CAMPBELL, LT. GONZALEZ and MAG. BURDEN failed to adequately control and supervise the subordinate officers under their command who were responsible for the arrest and the alleged used of excessive force against OWAKI, and that the supervisors themselves failed to intervene to prevent the alleged use of excessive force. OWAKI further claims that the arrest and the alleged use of excessive force were the result of policies, practices and customs of the CITY."

---

months.

[2] The Plaintiff originally filed suit against not only the remaining defendants, but the Sheriff of Broward County, Miami-Dade County, John Does 1-20, Jane Does 1-20, and Officer Doe 21, as well. On April 25, 2006, Plaintiff voluntarily dismissed the two-named Defendants, Kenneth C. Jenne, Sheriff of Broward County, and Miami-Dade County. On October 26, 2006, Plaintiff filed his Second Amended Complaint, which named only the City of Miami, Officer Darian Williams, Major Adam Burden, Lieutenant Gonzalez, Sergeant Dawn Campbell, and Miami Police Officer John Doe No. 1.

After careful consideration of the written submissions, oral arguments, and relevant case and statutory law, the Court grants all three (3) pending defense motions for summary judgment, filed on behalf of the four (4) individual Defendants, John Doe, and the City of Miami, pursuant to Rule 56 Fed. R. Civ. P. and Local Rule 7.5, and enters summary judgment in favor of all Defendants on Claims I, II, III, IV, V and VI of the Second Amended Complaint. As to the claims asserted in Plaintiff's Second Amended Complaint, the pleadings, affidavits, depositions, interrogatories, admissions, pretrial stipulation, Plaintiff's S.D. Fla. L. R. 7.5 Statement, and the videotapes documenting the protest, riot and Plaintiff's arrest when considered in the light most favorable to Plaintiff, show that there is no genuine issue as to any material fact. The moving parties in these three (3) motions for summary judgment are entitled to judgment as a matter of law.

## I. FACTUAL BACKGROUND

The City of Miami was designated as the site for a major International Conference of Ministers assembling for a meeting of the Free Trade Areas of the Americas (FTAA), during the week of November 17 thru November 24, 2003. The scheduling of this meeting received extensive national and international media coverage. (Def.'s Ex. "H" at 1.) This extensive publicity, occurring many months in advance of the actual date of the arrival of the ministers and other dignitaries who had been expected to attend, aroused the public interest. The agenda of subjects to be discussed by the ministers at FTAA was well known, and apparently highly controversial, to a substantial segment of the public.

3

Meetings of individuals, groups and organizations opposed to the announced purpose of FTAA were held across America (and perhaps elsewhere) to organize plans to protest during the week of November 17, 2003 at the FTAA meeting. At these group meetings, held in the locality where the protestors lived, instructions were given to those who intended to come to Miami about safety problems they could expect to encounter. The attendees at these local meetings were told how the protestors could best protect themselves against tear-gas, fire hose sprays of water, mace and other methods to which they might be subjected by local police, while exercising their First Amendment right to protest.

## A. **Preparation for the FTAA Protest**

The City of Miami Police Department was not unmindful of the probability that there might be as many as several thousand people coming to the site of the FTAA meetings to protest in a large demonstration. In anticipation of the attendance of several thousand protestors, the Chief of Police assembled a multi-agency law enforcement contingent of police officers from the City of Miami , Dade County, and Broward County Police Departments to formulate plans and training to ensure the security of the FTAA meetings, the safety of the participants and maintaining order on the streets of Miami during the anticipated protest.

Major Michael Columbo was put in charge of the training programs designed to prepare the City of Miami for the event. (Columbo Dep. at 11.) Major Columbo

4

contacted Community Research Associates (CRA), a federal government contractor that

regularly provides training courses throughout the nation to government agencies, to

assist with training the officers for the FTAA event. *Id.* at 23. The CRA provided

materials about other mass demonstrations so managing officers, such as Columbo, could

learn from similar situations. *Id.* at 50. Major Columbo testified that he specifically

studied an FTAA protest in Seattle, where the police dealt with troublesome violence,

because the protestors at the Miami FTAA event were expected to act similarly. *Id.* at 53.

The CRA also provided a variety of training courses. About fifty (50) ground

commanders, the officers in charge of decision making for the protest, took a forty (40)

hour command course from August 11 thru August 15, 2003. *Id.* at 25-26. Bike and

mass arrests training courses were also taught by lieutenants in the Police department. *Id.*

at 22.

　　　To ensure that the appropriate levels of force were used in controlling the crowd,

the command staff were all given the same "force continuum," a guideline for the rules of

engagement that all the agencies agreed they would use for the protest. *Id.* at 57-58. The

force continuum consisted of a "resistance matrix" specifying that the level of force

should correlate with the level of resistance offered against the officer. (Def.'s Ex. "H" at

7.) The Miami Police department's policy was that officers should use only the minimum

force necessary to affect arrest, apprehension or physical control of a violent or resisting

person. *Id.* at 6. Deadly, or potentially deadly, force was strictly prohibited, except as

necessary for self defense or the defense of another.

The Steering Committee decided the police officers would carry 36 inch wooden batons for the protest. (Columbo Dep. at 38.) The batons, which had last been used in riots in the late eighties and early nineties, were brought out of storage specifically for the protest. *Id.* at 63. Major Columbo testified that they decided to use this particular baton because "[it] is a much safer weapon for an officer and for a protestor." *Id.* at 39. The Committee felt the 36 inch baton was the best for pushing a crowd along. Major Columbo explained that a 36 inch baton is used for "[u]nlawful assembly, if [the protestors] are being resistant. In an act of resistance the baton can be used as a pushing mechanism, and it can be used to defend the officer, also." *Id.* It is safer because "[y]ou have to hold it with two hands. We teach you to hold it with two hands. You cannot use it in a tomahawk manner, and unless your hands slip which happens in these types of situations, and it's much less likely to be used in an overhang fashion, even though we don't train to use an overhang." *Id.* at 48. When asked for evidence that the 36 inch baton was safer, Major Columbo said his claim was based on anecdotal evidence of his own and his colleagues years of managing civil disorders rather than on a statistical study or official report. *Id.*

Training on the new 36 inch batons was extensive. The officers who monitored the demonstrations in response platoons trained on the batons one day a week for about two months. (Bueno Dep. at 22.) Officers were taught specific positions. Major

6

Columbo explained that the officers were taught to push not to strike:

> [W]hen we want to move crowds they are to hold the baton in what is
> called a port arms position or ready position. They hold the baton with two
> hands, one over and one under so the baton cannot be taken from their
> grasp. When the decision is made from a command level personnel to give a
> dispersal order to move the crowd, the officers are taught that they step one
> foot forward. They say 'back' if they can, if they can get their air in and
> they push.

(Columbo Dep. at 42.)

Training also included learning which strikes with the baton are not appropriate.
When asked whether he recognized that a line can be crossed between pushing and
excessive force, Major Columbo responded "[y]es, that's why we train them. We train
them over and over again to do the pushes and the strikes that are appropriate." *Id.* at 44.
According to Columbo, the officers are specifically trained not to hit certain places in the
body. "We don't teach anything that hits the vital parts of the body. *Id.* at 44. "[N]othing
above the shoulders is taught, nothing in the chest area, and nothing along the spine." *Id.*
at 45. Major Columbo's assertion that the police officers were taught not to strike above
the shoulders was confirmed by the other officers deposed.

## B. The FTAA Protest

Approximately 114 officers from the City of Miami Police Department, the
Broward County Sheriff's Office, and the Florida Highway Patrol were patrolling the
area around Biscayne Boulevard and Flagler Street in three field forces known as
"response platoons" (Fernandez Dep. at 11-13.)  Each response platoon, under the

7

command of Deputy Chief Frank Fernandez, was supervised by a lieutenant. *Id.* at 6, 14.

Even before the protest officially began, the police began to have a problem with a group of protestors that did not have a permit to march. (Fernandez Dep. at 18.) Assistant Chief Major Adam Burden testified that he and Chief Frank Fernandez jointly decided to allow the protestors to continue to march: "[b]ecause they were peaceful. They said they just wanted to watch. They were not going to set up camp... But they assured us that they were going to march through, go up to around Fifth Street and head out, and they were going to go. And so we agreed to let them on." (Burden August 10 Dep. at 65-67.)   However, "as they marched and they got close to the gates around the building where the FTAA meetings were to be held, they had what they call grappling hooks that they use to climb mountains. Somehow they got them on the gate.  A percussion grenade that lets out a loud noise, they had thrown a couple of those. And they tried to pull the gate down." *Id.* at 68.  The police responded quickly, pushing the protestors back from the gate. *Id.* at 69.

When the attempt to tear down the gate failed, the protestors became violent. Assistant Chief Burden testified: "[t]here was a stalemate.  There were still protesters being unruly, throwing objects at the police officers.  Attempting to take shields from the police officers." (Burden Sept. 6 Dep. at 6.)  Chief Fernandez testified: "the demonstrators, the ones that were actively aggressive, engaged the officers.  The officers then pushed forward giving them commands over the PA 'this is an unlawful assembly.' We kept repeating those instructions over and over again for them to leave. ... Some

8

people did heed the warnings that were given over the bull-horns, others did not."

(Fernandez Dep. at 51.)

At this point, the situation began to rapidly deteriorate: the protestors became more

violent and the protest degenerated into a riot. Chief Fernandez described the situation: "

[there were] ball bearings by screws and bolts that were being lunged by what they call

wrist rockets. These things are being tossed as if it was almost like a war out there.

There were just coming over bombing like rain." *Id*. at 52. Mixed in with the violent

protestors were many who simply linked arms and refused to move according to the

directions the police were giving over the megaphones. *Id*. Officer Darian Williams, who

arrested Plaintiff, testified that:

> "We pushed the crowd back to Flagler. Once we got them to Flagler we
> pushed them back to Biscayne and once we got to actually maybe like a
> hundred– maybe a hundred feet before Biscayne Boulevard that's when
> things were starting to be thrown. Some type of– I remember the guy that
> was next to me, some type of white fluid was thrown on him, covered his
> whole suit, into his helmet, into his face. Some of the poles with the puppet
> heads or whatever was on it, they were being thrown across the field force
> into the crowd towards us."

(Williams April 9 Dep. at 48.)

Officer Williams heard Major Burden giving order to leave over the megaphone

and testified that the protestors did not listen. *Id*. at 59. He stated:

> "When he gave the first dispersal order... he gave us several others. Then
> we were instructed to move the crowd back. So at that point the dispersal
> order had been given. So anyone that did not disperse at that time was in
> violation of that dispersal order. So then, at that point they were still
> shoving. So if they're shoving and we are shoving then obviously they're
> not dispersing."

*Id.*

### C. <u>Plaintiff Owaki at the FTAA Protest</u>

Plaintiff, Edward Owaki, learned of the intention of a group of fellow students at the University of Massachusetts to travel to Miami to protest against the meeting of FTAA, attended some group meetings and decided to travel to Miami to protest the meetings. After arriving in Miami with his friends and spending the night, Owaki proceeded to downtown Miami where thousands of other protestors had assembled to demonstrate against FTAA. (Pl. Dep. at 59.)

Plaintiff then joined in a human chain and did not move after the dispersal order was given. Officer Williams testified that "[Owaki] and the young ladies that were also arrested with him, I remember them interlocking their arms, if like– I guess they were just linking up and just standing ground. Not moving." *Id.* at 60.

Plaintiff's account of his general vicinity and actions is consistent with that given by Officer Williams. When asked why he joined a human chain, Plaintiff testified:

Q: Okay. At the time the human chain was forming, were the police trying to move the group that you were in some direction?
A: The police were - I didn't really see the whole extent of what was going on, really. But in other words, the police were moving up from - not Biscayne. So, yes, I'm basically - my understanding is that the sort of - from where the police were standing, the only way to really go would be up Biscayne Boulevard.
Q: Away from the Police?
A: Yes, away from everything.
Q: And by forming the human chain, that would stop the police from moving the crowd forward; is that correct? In the direction they wanted you to go?
A: Possibly so, yeah. There was some pretty - there were quite a few good

10

reasons why it wouldn't work, but it was, I guess, sort of at the time, it
seems to have been the feeling that, you know, something - Patrick
mentioned this. He really felt he needed to respond, you know, somehow
because I'm -
Q: Patrick felt you really needed to respond to what? The police trying to
get you to move forward up Biscayne Boulevard?
A: I guess, I guess so, find something that's not - although I really haven't
spoken to him too much since. So, yeah, pretty much, yeah.
Q: Prior to your forming or joining in to the human chain, did you hear any
command being given over a bullhorn or any other type of way telling the
people to disburse or move along?
A: Not, not clearly. I did hear there's - I think I did hear a bullhord, but I
was a good way, a good ways up the street, up Biscayne at the time. This is
before we - before the chain started forming up and before Patrick went
down Biscayne. And, also, there was a lot of background noise, because
they tried - the March had broken up, individual groups of people
discussing amongst themselves. And so I couldn't, for the life of me, say
exactly what was said.
Q: Across the bullhorn?
A: Right.

*Id.* at 59-61.

Prior to his arrest by Officer Williams, Plaintiff was struck on the head by an

unidentifiable police officer with a 36 inch riot baton. There is no live testimony about

what occurred immediately preceding or during Plaintiff's arrest. The only evidence

regarding what actually happened to Plaintiff is found on an approximately 10 second

long portion from news media video taken the day of the protest. (Def.'s Exs. "B" and

"C.") The videos present a view of the crowd from overhead, showing the intensity and

violence of the riot that occurred. The few-second video segment shows a person,

presumed to be Plaintiff, being struck three times with a baton, by an unidentified man in

police uniform. From the video, it is very difficult to ascertain with any degree of

11

certainty what precisely happened to Plaintiff. It is difficult to identify Plaintiff and impossible to identify his assailant, who is fully clad in riot gear and helmeted. (Def.'s Ex. "C.") Plaintiff cannot offer any evidence regarding what happened during this time period since he cannot recall what happened after being struck.

None of the officers whose depositions were taken saw Plaintiff when he was hit and injured. Officer Williams, the officer with the most contact with Plaintiff that day, testified:

> Q: ... Did you arrest [Plaintiff]?
> A: Yes.
> Q: Did you see it when he was hit with the baton on the head?
> A: No.
> Q: Where did that baton come from?
> A: I couldn't tell you.
> Q: Did you hit [Plaintiff] over the head with the baton?
> A: No, sir.
> Q: Did you ever use the baton on [Plaintiff]?
> A: No.

Plaintiff's account of the circumstances surrounding the incident when he was hit is no more illuminating:

> A: I'm facing up the street away from the police, I can't– I can't really say much about the incident itself... And I'm facing up the street, I really didn't know exactly what hit me. It was just– I have a blank in my memory that's– at what point I'm standing up. But I've linked arms to the people standing next to me facing up the street, and my memory skips. And the next thing I remember I am face down on the ground and feel pinned, because I tried to get up and I can't really move, and I feel pinned. And let's see... I try to get up, and can't really. I'm not sure about the details. I believe I get picked up and I believe– yeah. I think I got picked up... I'm sorry, if it's any consolation, the details stop being sketchy right after this.
> Q: The details are sketchy before this?
> A: The details stop being sketchy after this. Once I get arrested, I should

remember the details.
Q: So it is after you're picked up that your memory is not as sketchy?
A: Pretty much so. I'm picked up and more taken behind the line and –
taken behind the line and handcuffed, I believe.

(Pl. Dep. at 56-57.)

Therefore, regarding the incident that caused Plaintiff's injury, all that is known

with certainty is that while participating in a protest march a violent riot ensued, and

Plaintiff was injured when struck on the head with a riot baton by an unidentified person

dressed in the riot gear and uniform worn by the police. No witnesses (other than police)

were ever found. The sworn testimony of the three police officers present at the time

reflects that they did not see Plaintiff. (Burden Dep. at 90, Gonzalez Dep. at 45,

Campbell Dep. at 39.). There is no evidence in this record that any police officer saw the

Plaintiff being hit, stood by and failed to intervene. No independent civilian witness,

either protestor or observer, has furnished sworn testimony in this record of what

happened, how it happened, or who struck Plaintiff. Except for an approximate ten-

second film clip, taken by a TV news cameraman, there is no evidence by any witness of

Plaintiff being struck. Plaintiff's assailant has never been identified and is unknown to

this date.

Defendant Sergeant Dawn Campbell was in charge of the squad that handled and

processed the arrests of protestors after the police officers brought them back from the

front line to where she was stationed. (Campbell Dep. at 35.) She was standing close to

Major Burden as he was giving dispersal orders, and could hear his orders telling the

13

protestors to move on and disperse. *Id.* at 86. She testified that the officers at the front were deciding who should be arrested and sending the arrestees to her for processing. *Id.* She never saw Plaintiff before he was brought back to her for processing after his arrest. *Id.* at 38, 39. She did not see anyone strike Plaintiff, or see him fall.

Officer Darian Williams testified that after Plaintiff was brought behind the line of officers, Sergeant Campbell told him to arrest the Plaintiff and some other protestors. (Williams Oct. 5 Dep. at 139.) "[H]e was read the dispersal order. He was pulled through the line. He was arrested." Sergeant Campbell later assisted Officer Williams prepare Plaintiff's arrest affidavit. *Id.* at 145.

After the arrest, Plaintiff began to remember events with greater clarity. He recalled being handcuffed and moved by the arresting officer to a bus, and then being taken to Jackson Memorial Hospital's Ward D where medical personnel checked him for a concussion. (Pl. Dep. at 71-75.) After being released from the hospital, Plaintiff was taken to jail where he spent the night in a cell. The next morning he had a hearing, was released on bond and taken to the infirmary for a final check. After his bond was posted, he was picked up by friends and taken to the hospital emergency room, where the doctor concluded he had an epidural hematoma. Plaintiff remained in the hospital for nine (9) days. *Id.* at 80-85. According to the City's After Action Report of January 30, 2004, the City attempted to investigate the incident after it was reported in the media, but originally was unable to locate Plaintiff. (Def.'s Ex. "H.")

Plaintiff has filed claims against the unidentified police officer for use of excessive

14

force, against the City of Miami for the state torts of false arrest and battery, against

Officer Darian Williams and Dawn Campbell, a supervisor present at the protest, for

deprivation of rights under the First, Fourth, and Fourteenth Amendments, and against

Supervisors Adam Burden, Marilyn Gonzalez, and Dawn Campbell for failure to

supervise pursuant to 42 U.S.C. § 1983. All parties have filed motions for summary

judgment.

## II. **STANDARD OF REVIEW**

Rule 56 ( c) of the Federal Rules of Civil Procedure authorizes summary judgment

where the pleadings and supporting materials establish that there is no genuine issue as to

any material fact that the moving party is entitled to judgment as a matter of law. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court's focus in

reviewing a motion for summary judgment is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F. 3d 642, 646 (11th

Cir. 1997). The moving party has the burden to establish the absence of a genuine issue

as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970);

*Tyson Foods, Inc.*, 121 F. 3d at 646. Once the moving party has established the absence

of a genuine issue of material fact, to which the nonmoving party bears the burden at

trial, it is up to the nonmoving party to go beyond the pleadings and designate "specific

facts showing that there is a genuine issue for trial." *Celotex v. Carrett*, 477 U.S. 317,

324 (1986). Issues of fact are genuine only if a reasonable jury, considering the evidence

presented, could find for the nonmoving party. *See Anderson*, 477 U.S. at 247-51. In determining whether to grant summary judgment, the district court must remember that "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255. A mere scintilla of evidence in support of the non-moving party's position is insufficient, however, to defeat a motion for summary judgment. *Id.* at 252. If the evidence is merely colorable or is not significantly probative, summary judgment is proper. *Id.* at 249-50. Finally, the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327.

## III. ANALYSIS

### A.  Arguable Probable Cause and/or Probable Cause for Arrest

Plaintiff alleges that Officer Williams and Sergeant Campbell, both sued individually, under 42 U.S.C. §1983, violated his right to freedom from an unreasonable seizure of his person as guaranteed by the First, Fourth, and Fourteenth Amendments to the Constitution of the United States. Plaintiff alleges that Defendant Williams, unlawfully and without probable cause, seized and arrested Plaintiff while he was standing and walking on a public way and unlawfully charged and arrested him with disorderly conduct. Plaintiff also alleges that Defendant Campbell unlawfully directed Officer Williams to charge Plaintiff with disorderly conduct and unlawfully instigated

formal proceedings against him.  Further, Plaintiff alleges that the Defendant City of

Miami is liable for the state tort of false arrest pursuant to Fla. Stat. § 768.28 because the

City was responsible for the actions of the officer who arrested him without probable

cause or a warrant.

Reviewing the facts in the light most favorable to Owaki, it is clear that the police

officers had both arguable probable cause and probable cause to arrest Owaki.

Both federal and Florida state law hold that probable cause exists when an arrest is

reasonable under the totality of the circumstances: "this standard is met when the facts

and circumstances within the officer's knowledge, of which he or she has reasonably

trustworthy information, would cause a prudent person to believe, under the

circumstances shown, that the suspect has committed, is committing, or is about to

commit an offense." *Lee v. Ferraro*, 284 F. 3d 1188, 1195 (11th Cir. 2002) (citations

omitted).  Thus, to evaluate probable cause, the Court's inquiry focuses on the officer's

knowledge and belief that the person being arrested has committed, is committing or is

about to commit an offense.

However, in the case at hand, Defendants do not have to establish probable cause,

arguable probable cause is "all that is required for qualified immunity to be applicable to

an arresting officer." *Scarbrough v. Myles*, 245 F. 3d 1299, 1302 (11th Cir. 2001).  "To

receive qualified immunity protection, an officer need not have actual probable cause but

only arguable probable cause." *Holmes v. Kucynda*, 321 F. 3d 1069, 1079 (11th Cir.

2003) (citations and internal quotation marks omitted).  According to the Eleventh

17

Circuit, the standard for arguable probable cause is not whether a reasonable officer in the same circumstances and with the same knowledge should have or would have reasonably believed that probable cause existed, but whether such an officer could have found probable cause. *Brescher v. Von Stein*, 904 F. 2d 572, 579 (11th Cir. 1990). (In determining whether arguable probable cause existed and "applying the qualified immunity test in the context of Plaintiff's alleged unlawful arrest, we must determine whether reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed.") This is a lower standard than that required for "actual" probable cause. *Holmes*, 321 F. 3d at 1079 (for qualified immunity "the inquiry is not whether probable cause actually existed, but instead whether an officer reasonable could have believed that probable cause existed, in light of the information the officer possessed") (citations and internal quotation marks omitted).

In this instance, the uncontradicted facts prove that the officers had both arguable probable cause and probable cause to arrest Owaki for violating Fla. Stat. § 843.02; resisting officers without violence to his or her person.[3] The officers consistently testified, and Plaintiff does not dispute, that many of the protestors in the area had become violent. Major Adam Burden testified that "[t]here were protestors being unruly,

---

[3] Although Plaintiff notes that the original charge against the Defendant, a violation of Fla. Stat. § 877.03 "disorderly conduct," was later changed by Defendants, the change of offense does not eliminate a valid probable cause.

throwing objects at the police officers. Attempting to take shields from the police officers." (Burden Sept. 6 Dep. at 6.) Deputy Chief Fernandez testified that "[he] almost got hit in the head five or six times, if not more, by ball bearings by screws and bolts that were being lunged by what they call wrist rockets. These things are being tossed as if it was almost like a war out there. There were just coming over bombing like rain." Other officers had paint thrown on them. (Fernandez Dep. at 52.) Deputy Chief Fernandez also testified that "[he] vividly remembers several groups engaging the officers and pushing them." *Id.* at 53. One front line officer, Manny San Juan, suffered a serious back injury when a protestor attacked him, and had to retire from the force. *Id.* at 55.

After this violence erupted, the police cleared the area. Chief Fernandez testified that he instructed Major Burden and another officer to tell the protestors over the megaphone: "This is an unlawful assembly. You're ordered to leave the area." *Id.* at 54. He testified that these orders were given repeatedly, along with instructions that the protestors should move to specific streets. *Id.* Officer Burden testified that at around 10:00 a.m., he and another officer were asking people to leave with a megaphone, but they were throwing objects and refusing to leave. Once some of the protestors began to throw paint, rocks, and other objects, he and another officer began to order them to disperse using megaphones. (Burden Dep. at 78.) Officer Williams, the arresting officer, testified that Major Burden was directly behind him when he gave several orders to disperse. (Williams Dep. at 54, 59.) Major Burden then instructed him to move the crowd back. Defendant Officer Williams stated that, at this point, everyone who had

19

failed to leave "was in violation of the dispersal order." *Id.* at 59. Officer Williams remembers that after the dispersal order had been given, Plaintiff had linked arms with fellow protestors, which he interpreted as a failure to leave as ordered: "I remember them interlocking their arms, if like– I guess they were just linking up and just standing ground. Not moving." *Id.* at 61.

Plaintiff's testimony was not inconsistent with that of the officers. Plaintiff describes his memory of the incident prior to his arrest as "sketchy" (Pl. Dep. at 56-57.) He testified "[b]ut I've linked arms to the people next to me facing up the street, and my memory skips. And the next thing I remember I am face down on the ground and feel pinned... I'm not sure about the details. I believe I get picked up... " Plaintiff concedes that he joined a human chain, and that he did hear the bullhorn. *Id.* at 59-60. There is no dispute that Plaintiff was in the area where the riot was occurring and police were attempting to clear.

Under the undisputed facts of this case, there is no genuine issue of material fact as to whether Officer Williams believed or could have believed that Plaintiff was violating the law. Officer Williams testified that he heard Major Burden give a dispersal order to the protestors on the megaphone, and that instead of dispersing, he saw Plaintiff link arms with his fellow protestors. (Williams Dep. at 54, 59 and 61.) Under the circumstances, a reasonable officer in his position certainly could have believed that Plaintiff meant to disobey the dispersal order and thus was knowingly participating in an unlawful assembly. Furthermore, the uncontradicted facts show that, under the

20

circumstances, Officer Williams was objectively reasonable when he arrested Plaintiff in concluding Plaintiff meant to disobey the order to disperse, and thus, was subject to arrest.

Similarly, Sergeant Campbell, located behind Officer Williams, was justified in relying upon the actions and directions of fellow officers at the time of the arrest. Under the "fellow officers rule" recognized in Florida, officers are allowed to rely on the representations of other officers. *Dept. of Highway Safety v. Shonyo*, 659 So. 2d 352, 353 (Fla 2nd DCA 195) ("The fellow officers rule allows an arresting officer to assume that probable cause to arrest a suspect exists when he relies upon the representations of an officer who has firsthand knowledge of events."). Officer Williams testified that the police officers at the front of the line were deciding who to arrest. (Campbell Dep. at 86.) By bringing certain protestors through the line, the front line police officers were making the implicit representation to Sergeant Campbell that those were the protestors who should be arrested and processed.

Thus, both Defendants had arguable probable cause and probable cause to arrest Plaintiff Owaki. Under a claim for false arrest, the Plaintiff must prove a false arrest occurred. Since this Court finds that Plaintiff was lawfully arrested, the City of Miami cannot be held liable for the state tort of false arrest.

## B. Freedom of Expression

Plaintiff alleges that Defendants Williams, Campbell, Burden, and Gonzalez prevented him from exercising his First Amendment right to freedom of expression

21

because he was arrested while exercising his First Amendment rights. However, a validly arrested Plaintiff does not have a First Amendment claim, even if he was exercising his First Amendment rights at the time he was arrested. *Redd* v. *City of Enterprise*, 140 F. 3d 1378, 1383 (11th Cir. 1998) ("When a police officer has probable cause to believe that a person is committing a particular public offense, he is justified in arresting that person, even if the offender may be speaking at the time that he is arrested."). Nor does Plaintiff's arrest become a violation of his constitutional rights because ultimately he was charged with a different crime than the one he was arrested for: "[t]hat a defendant is subsequently acquitted or charges are dropped against the defendant is of no consequence in determining the validity of the arrest itself." *Marx v. Gumbinner*, 905 F. 2d 1503, 1507 (11th Cir. 1990); *see also Trivette* v. *State*, 244 So. 2d 173, 175 (Fla. DCA 1971); *Brown v. State*, 91 So. 2d 175, 177 (Fla. 1956). The arrest of Plaintiff under these circumstances was clearly valid, rendering this claim without merit.

## C. Excessive Use of Force

### i. The Unknown Defendant

Count III of the Second Amended Complaint alleges that an unknown Miami Police Officer, John Doe No. 1, struck Plaintiff from behind with a police baton, using excessive force in violation of Plaintiff's rights under the Fourth and Fourteenth Amendments. (Second Am. Comp. at 13.) However, John Doe No. 1 has never been

identified in the three and a half years since the incident occurred.[4] Although there is no factual dispute on whether the unidentified Police officer used excessive force in violation of the constitution, fictitious party practice is not allowed in Federal Courts. *New* v. *Sports and Recreation, Inc.* 114 F. 3d 1092, 1094 (11th Cir. 1997). The unserved fictional defendant John Doe No. 1 must be dismissed.

### ii. Claim of Excessive Use of Force Against Known (named) Defendant Officers

In Count VI, Plaintiff alleges that as a direct and proximate result of Major Burden, Lieutenant Gonzalez and Sergeant Campbell's actions, all three-named Defendants, individually, under 42 U.S.C. § 1983, violated Plaintiff's rights under the First, Fourth, and Fourteenth Amendments by their failure to control a fellow officer's use of excessive force. Plaintiff alleges that while Defendants Burden, Gonzalez and Campbell were on the scene, they failed to control and supervise subordinate officers under their command who beat Plaintiff over the head with a police baton. Plaintiff asserts these Defendants deliberately overlooked and ratified police misconduct by failing to control and discipline the officer. They allowed an officer under their control to jab and strike the Plaintiff, and failed to intervene to stop excessive force from being used.

Because Plaintiff has no evidence that any of the defendant officers struck him with the baton, he is attempting to establish liability by alleging they were present at the scene and failed to intervene. In *Skrtich* v. *Thorton*, the Eleventh Circuit stated that

---

[4] The parties have had ample time to find him in discovery. Presumably, the officer in question will never be identified.

indeed "[i]t is not necessary that a police officer actually participate in the use of excessive force in order to be held liable under 42 U.S.C. § 1983.   Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his non-feasance." *Skrtich* v. *Thorton*, 280 F. 3d 1295, 1302 (11th Cir. 2002).   However, the instant case may be distinguished from such cases where police officers could be held liable even though they were not the ones to use the excessive force on the plaintiff, because none of the Miami police officers were present at the scene such that they could have taken steps to prevent the use of excessive force.

In *Skrtich*, the plaintiff, an inmate of the Florida State Prison, sued the defendant officers for using excessive force when they went to his cell to perform a "cell extraction." *Id*. at 1299.  The plaintiff alleged that six officers came to his cell to forcibly remove him, and administered an electric shock, which knocked him to the ground. *Id*. The plaintiff testified that, once on the floor, he presented no resistance, but four of the subordinate officers struck and kicked him repeatedly, causing him extensive injuries, while the two superior officers watched the beating and did nothing to stop it. *Id*. at 1300.  He therefore sued all of the officers.  The Court found that all of the officers present in the cell could be held liable, whether they themselves participated in the beating or not. *Id*. at 1302.

The facts in the instant case are very different.  Unlike the plaintiff in *Skrtich*, who testified that all of the officers were present in his prison cell, where they had gone

24

specifically to subdue him, and either acquiesced or participated in a lengthy beating, Plaintiff Owaki cannot place any of the defendant police officers at the scene during the brief moment an officer struck him with the riot baton.

Plaintiff, who was dazed and disoriented, does not have any memory of events linking these Defendants to what happened to him. The only evidence of record is the testimony of the Defendant police officers.  Defendants Burden, Gonzalez, Campbell and Williams testified that they did not see anyone strike Plaintiff, nor did they (except Williams) ever remember seeing Plaintiff at all before he was arrested.  Assistant Chief Major Burden testified that he never saw Plaintiff that day.  (Burden Sept 6 Dep. at 90.) Lieutenant Marilyn Gonzalez testified she did not see anyone use a baton in an unacceptable overhead strike that day.  (Gonzalez Dep. at 45.)  Sergeant Dawn Campbell was involved in compiling the arrest affidavit, but she testified that she did not see Plaintiff until after the incident had already occurred.  (Campbell Dep. at 39.)

Plaintiff only has a vague memory of the event and offered no testimony placing Burden, Gonzalez, or Campbell even at the scene, let alone testimony that any of these officers stood by, watched and failed to stop the assailant.  The video demonstrates that the whole incident took place in approximately 10 seconds and was over almost as soon as it began.  The officers were most likely in relatively close proximity to the Plaintiff while the ten second beating occurred.  However, there is no evidence whatsoever that among the chaos that erupted when the protestors, crowded into the area, began to attack the police, any of the officers noticed or should have noticed one officer briefly violating

25

his training by using an overhead strike on a protestor. There is also no evidence that the named officers could have taken steps to prevent Plaintiff's assailant from his use of excessive force even if they had seen it occurring.

There is no evidence to support Plaintiff's claim that officers Burden, Gonzalez, Campbell or Williams deliberately ignored their duty by failing to prevent Plaintiff's injury; or to knowingly standing by and watching Plaintiff being struck without preventing the incident. Plaintiff has failed to carry his burden of producing evidence on these allegations. The charge that Defendants Burden, Gonzalez, Campbell and Williams should have stopped Plaintiff from being struck is unsupported by the record.

### iii.  **The City of Miami**

Plaintiff further alleges that the Defendant City of Miami is liable for the state tort of battery pursuant to Florida Statute §768.28 because the City was responsible for the actions of the police officer who struck Plaintiff. (Second Am. Complaint, Count IV.) However, Subdivision 15 of §768.28 states:

> No action may be brought against the state or any of its agencies or subdivisions by anyone who unlawfully participates in a riot, unlawful assembly, public demonstration, mob violence, or civil disobedience if the claim arises out of such riot, unlawful assembly, public demonstration, mob violence, or civil disobedience.

§ 768.28, subdivision 15. The uncontested testimony and video evidence show that the Plaintiff was participating in an unlawful demonstration at the time Plaintiff was struck by the police officer and arrested. The uncontradicted testimony of Major Burden, Officer Williams, Chief Fernandez, and the other deposed officers demonstrates that

26

Plaintiff was participating in an unlawful assembly once the officers began to instruct the protestors to disperse over their megaphones. Plaintiff's claim under §768.28 is therefore barred.

Plaintiff also attempts to point to the After Action Report, in which the Police Chief described the FTAA protestors as a "separate but highly interdependent" part of a "disturbing new protest movement" that "has made chaos and violence their primary message" to support an inference that the Chief encouraged a policy that did not distinguish between peaceful and violent protestors. However, the Chief's report could not be the moving force behind the constitutional violation on November 20, 2003, because the After Action Report describes the reactions to the protest *after* the incident happened. Nor does the Chief encourage treating violent and non violent protestors the same, he simply mentions that protestors combined and collaborated such that the non violent ones provided cover for the violent in an unexpected fashion: "these are not your father's protestors." (Pl.'s Resp. at 9.) If anything, Chief Timoney's after the fact description of the police as caught by surprise by the protestors' behavior supports the inference that the City was not on notice about any potential inadequacy of its training.

### D. **Failure to Train**

#### i. **Municipal Liability**

Finally, Plaintiff alleges that the City of Miami is liable under 42 U.S.C. § 1983 for failure to properly train its officers. However, Plaintiff must surmount a high burden to hold the City liable for a deprivation of Constitutional rights under 42 U.S.C. § 1983.

27

A municipality is not vicariously liable under 42 U.S.C. § 1983 for the actions of its employees: "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *see also City of Canton* v. *Harris*, 489 U.S. 378, 385 (1989). To establish that an official policy caused the tort, Plaintiff must identify either "(1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." *Grech* v. *Clayton County*, 335 F. 3d 1326, 1329 (11th Cir. 2003). Most plaintiffs must use the second method, "[b]ecause a county rarely will have an officially-adopted policy of permitting a particular constitutional violation." *Id.* at 1330. Whichever method the plaintiff uses, he must both prove that the local governmental entity has authority and responsibility over the governmental function in issue, and he must identify "those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue." *Id.*

To prove 42 U.S.C. § 1983 liability against a municipality based on the second method, an unofficial custom, a plaintiff must establish a practice so widespread that, "although not authorized by written law or express municipal policy," it is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Brown v. City of Fort Lauderdale*, 923 F. 2d 1474, 1481 (11th Cir. 1991). If a practice is "long-standing and widespread," it can be "deemed authorized by the policy-making officials because

28

they must have known about it but failed to stop it." *Id.* A failure to stop mere isolated incidents cannot be deemed tacit approval: "random or isolated incidents are insufficient to establish a custom or policy." *Depew v. City of St. Marys*, 787 F. 2d 1496, 1499 (11th Cir. 1986).

Because of this high burden for plaintiffs attempting to establish municipal liability for the constitutional torts of employees, even a city that did fail to adequately train or supervise police officers would not automatically be liable under 42 U.S.C. §1983 if one of its police officers committed a constitutional tort:

> There are only 'limited circumstances' in which an allegation of a failure to train or supervise can be the basis for liability under § 1983... The Supreme Court has instructed that these 'limited circumstances' occur only where the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights.

*Gold v. City of Miami*, 151 F. 3d 1346, 1350 (11th Cir. 1998).

Cities very rarely have express policies of inadequate training or supervising, so a plaintiff generally needs to "prove a city policy by showing that the municipality's failure to train evidenced a 'deliberate indifference' to the rights of its inhabitants." *Id.* In order to establish such deliberate indifference, a plaintiff "must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Id.* Without notice of a need to train in the area that turned out to be inadequate, the municipality is not liable as a matter of law. *Id.* at 1351. What makes the City liable is having an inadequate policy

by design or indifference. This high standard of proof is intentionally onerous for

plaintiffs. *Id.* The Eleventh Circuit has made the reasons for such a high burden clear:

> to adopt lesser standards of fault and causation would open municipalities
> to unprecedented liability under § 1983. In virtually every instance where a
> person has had his or her constitutional rights violated by a city employee, a
> § 1983 plaintiff will be able to point to something the city "could have
> done" to prevent the unfortunate incident. Thus, permitting cases against
> cities for their "failure to train" employees to go forward under § 1983 on a
> lesser standard of fault would result in de facto respondeat superior liability
> on municipalities...

*Id.* (citing *City of Canton*, 489 U.S. at 391-92).

## ii. **Plaintiff Has Not Established a Failure to Train**

Plaintiff must surmount a high burden to prove that his injury was a result either of

a deliberate policy of the City of Miami or of a known deficiency in training that the City

of Miami chose not to address. The Plaintiff's tort consisted of three (3) overhead strikes

by a riot baton, which parties have stipulated was excessive force in violation of the

constitution.

Plaintiff cannot prove that this injury was caused by an official policy of the City,

when all officers testified that the officer who struck him in such a manner violated his

training. All evidence shows that the City of Miami trained its officers not to perform

overhead strikes using a riot baton. The officers were taught that such a strike, to the

head, was potentially lethal force, not to be used except in self-defense. For instance,

Officer L.J. Bueno, an officer on the scene, responded "No, no," when asked if the

overhead strike to the Plaintiff he saw on the video captured by the media was legal or

30

justified. (Bueno Dep. at 30.) Officer Williams testified "[i]t was excessive from what I watched on the video" because "we weren't taught to make overhead strikes." (Williams October 5 Dep. at 135.) Assistant Chief Burden said the overhead strike was "[u]nacceptable," clarifying that "we have trained all our officers, and we trained them year after year with strike weapons as the asp, the PR24. You are not to utilize the device in that type of fashion." (Burden Sept. 6 Dep at 46.) Officer William Goins also thought the use of force was unjustified: "[i]n my training, we [were] taught not to overhand strike." (Goins Dep. at 63.) No officer testified to such force being considered appropriate. The strike to the head that the Plaintiff suffered was therefore very specifically against the training the police received from the City of Miami and not an official policy of the city.

Nor did the City have an official policy of failing to train police officers to handle crowds. All evidence shows that, in the months before the FTAA protests, the City attempted to train the officers to deal with the situation. The City had a committee set up for the purpose of training for the particular protest, and it conducted many drills and classes, with the express purpose of preparing its police officers to respond effectively to the FTAA event.

Plaintiff therefore must use the second method available for municipal liability under *Monell* and *Gold.* He must prove that the City not only had inadequate training, but was also on notice of a need to train in that particular area, so that he can demonstrate the City had, what amounted to, an unofficial policy that violated the constitution.

31

Plaintiff attempts to meet this burden by alleging that inadequacies in the officer's training program led to his injury. He alleges that the overhead strike that resulted in his going to the hospital for nine days resulted directly from the City's unofficial policy of condoning excessive force against non-violent protestors.

Plaintiff argues this unofficial policy was expressed through the City's deliberate indifference to the deficiencies of the training program it implemented in preparation for the FTAA demonstrations. (Pl.'s Resp. at 4-5.) Plaintiff's expert, a retired police commander in the State of Indiana, offers his opinion that the City handled the protest poorly, made a poor choice to use the 36 inch baton, did not adequately supervise the officers and generally did not equip the officers to handle an escalating situation in an appropriate manner through appropriate training. Plaintiff claims that the city's official use of the 36 inch riot batons to move a crowd of mostly non violent protestors indicated a loss of supervision, a lack of discipline, inadequate and incorrect training, and a lack of control by the commanding officers. (Pl.'s Ex. "B" at 18.) The Plaintiff also argues that the Rules of Engagement Guidelines were confusing because they provided too little explanation about the proper use of force and allowed too much discretion to the officers. Plaintiff does not have sufficient evidence to back up these allegations to satisfy his burden under *Monell* and *Gold*.

### a) The Use of Plaintiff's Expert

Plaintiff relies on the declaration and testimony of Plaintiff's expert, Mr. Danaher, to create a genuine issue of material fact. *Daubert v. Merrell Dow Pharms.*, 509 U.S.

32

579, 592 n. 10 (1993). In determining the admissibility of expert testimony under Rule

702, the Court considers whether:

> (1) the expert is qualified to testify competently regarding the
> matters he intends to address; (2) the methodology by which
> the expert reaches his conclusions is sufficiently reliable as
> determined by the sort of inquiry mandated in Daubert; and
> (3) the testimony assists the trier of fact, through the
> application of scientific, technical, or specialized expertise, to
> understand the evidence or to determine a fact in issue.

*U.S. v. Frazier*, 387 F. 3d 1244, 1260 (11th Cir., 2004). "The burden of laying the proper

foundation for the admission of the expert testimony is on the party offering the expert,

and admissibility must be shown by a preponderance of the evidence." *Cook v. Sheriff of*

*Monroe County*, 402 F. 3d 1092, 1107 (11th Cir., 2005).

As Rule 702 requires the party offering the expert to fulfill all three requirements,

the Court's analysis will focus only on whether the testimony will be helpful to the trier

of fact. "By this requirement, expert testimony is admissible if it concerns matters that

are beyond the understanding of the average lay person. Proffered expert testimony

generally will not help the trier of fact when it offers nothing more than what lawyers for

the parties can argue in closing argument." *Id.* at 1111 (quoting *Frazier*, 387 F. 3d at

1262-63). Further, "nothing in either Daubert or the Federal Rules of Evidence requires a

district court to admit opinion evidence which is connected to existing data only by the

ipse dixit of the expert....[a] court may conclude that there is simply too great an

analytical gap between the data and the opinion proffered" *Id.* (quoting *General Electric*

*v. Joiner*, 522 U.S. 136, 146 (1997)). "Thus, a trial court may exclude testimony that is

33

'imprecise and unspecific,' or whose factual basis is not adequately explained." *Id.*

(citing *Frazier*, 387 F. 3d at 1266.) "Simply put, expert testimony may be assigned

talismanic significance in the eyes of lay jurors, and, therefore, the district courts must

take care to weigh the value of such evidence against its potential to mislead or confuse."

*Id.* (quoting *Frazier*, 387 F. 3d at 1263).

With this in mind, the Court turns to the declaration and testimony of Mr.

Danaher:

Mr. Danaher's first opinion – that the city made a poor choice to use the 36 inch

baton – is not helpful to the trier of fact. Mr. Danaher states that

> the 36 inch baton poses a higher risk of injury to the public and to
> the police...[it] is limited in its use and does not have the range of
> options in techniques to use the weapon to control persons other than
> by employing the striking techniques. This is clearly demonstrated
> in the Miami Police Department's lesson plan for the 36 inch baton.
> A large part of the training materials focus on "strikes." With the 36
> inch baton, an officer is limited in his options. The officer can only
> block, or strike. An officer carrying a 36 inch baton instead of the
> PR-24 does not have several defensive options other than striking
> available, resulting in the unnecessary escalation of the levels of
> officer response to minimal citizen resistence.

(Mr. Danaher's Declaration ¶ 107, 111.) The average person serving as a lay juror is

perfectly capable of understanding the film exhibits demonstrating the Plaintiff being

struck three (3) times over the head with a "Tommy Hawk" or, full swinging blow to the

skull. They need no expert to tell them that this is wrong, indeed it is agreed by all

concerned that all of the training, teaching, manuals and administrative orders regarding

the handling of riot crowds prohibits the striking of any protestor in a vital area ("not

34

above the shoulders"), unless such force is absolutely necessary to protect a fellow officer in self defense from physical harm to the officer. Mr. Danaher's declaration does not assist the trier of fact in its determination of the question at issue: whether the Miami Police Department's decision to use the 36 inch baton instead of the PR-24 was based on deliberate indifference to the rights of the protestors. Mr. Danaher does not even discuss the Miami Police Department's decision-making process or allege that the city chose to use the 36 inch baton even though it knew the 36 inch baton was improper. Plaintiff's expert, Mr. Danaher, makes no attempt to scientifically explain why use of a 36 inch baton (instead of a 24 inch or 12 inch baton) either (a) was more likely to cause Plaintiff's injuries than use of a shorter baton, or (b) is more dangerous to the Plaintiff, or (c) would have prevented the tragic blows to the head. Thus, Mr. Danaher's testimony is of no assistance to the trier of fact.

Even if Mr. Danaher's testimony was admissible under Rule 702, it is directly contradicted by the record. According to Officer Columbo, the decision to use these batons instead of another weapon was made by the Steering Committee established specifically for the FTAA protests. Based on personal experience as police officers, the Committee decided to use the baton because they felt they were the safest weapon for the situation. The Committee noted that it is the best weapon for pushing a crowd along and that an officer is much less likely to use it in an overhang or tomahawk position. There is therefore no evidence that the City chose the baton with indifference to whether it was the right weapon for the job.

Mr. Danaher's second opinion – that the officers received deficient training which was below acceptable police standards – is unsubstantiated. In his declaration, Mr. Danaher asserted that

> the Miami Police Department's training consisted of a one-hour classroom session followed by a field training...The field training lasted only for as long as the supervisor thought it was necessary for him to determine whether everyone in the platoon had demonstrated proficiency in the use of the weapon. As contrasted with the PR-24, there was no test which had to be passed and there was no certification of competency issued after completion of the training, and competency was determined essentially by a subjective judgment of the supervisor. Follow up training was the responsibility of the individual platoon supervisor and was conducted only after the request of the platoon and squad supervisors. There was no uniform schedule of follow up training. Thus, the institutional safeguard that certification provides was not put in place for use of the 36 inch baton.

(Declaration of Mr. Danaher ¶ 105.) Mr. Danaher presents no evidence that the Miami Police Department knew of an accepted standard for training the officers on the 36 inch batons and made a deliberate choice not to meet that standard. Instead, Mr. Danaher simply opines that the Miami Police Department's training was inadequate; this is not helpful to the trier of fact.

In fact, Officer Bueno testified that the training on the new 36 inch batons was extensive: the officers trained on the batons one day a week for about two months and were taught which strikes were inappropriate. Officer Columbo testified that the officers were trained "over and over again to do the pushes and the strikes that are appropriate." (Columbo Depo. at 44.) Further, Assistant Chief Burden explained that the officers are

36

trained "year after year with strike weapons...not to utilize the device in [an overhead strike]." (Burden Depo. at 46.) The police department was not deliberately indifferent to the threat of the 36 inch batons - it provided significant training to protect the citizens of Miami. The record, rather than demonstrating that the City's inadequate policies are responsible for the use of excessive force on Plaintiff, demonstrates that the unidentified officer's excessive use of force actually violated his training not to use overhead strikes with a baton.

Mr. Danaher's third opinion - that the officers were not adequately supervised – is "connected to existing data only by [his] ipse dix it. In his declaration, Mr. Danaher states that "the lack of on-site supervision and control was part of the Miami Police Department's overall failure to establish procedures that would insure individual officer accountability in a crowd control situation. Line officers were not trained to intervene and/or acts of excessive force by other officers." (Mr. Danaher Declaration ¶ 78.) Once again, Mr. Danaher's unsubstantiated opinion does not assist the trier of fact in its determination of the issue before it: the Miami Police Department's knowledge of a need for commander supervision during the FTAA protest and its deliberate choice not to prepare the commanders for such supervision.

On the other hand, the record shows that the Miami Police Department did take action to prepare its commanders for supervision at the protest. The fifty (50) ground commanders in charge of the decision making at the FTAA protest, attended a forty (40) hour command course. Furthermore, the CRA provided materials about mass

37

demonstrations so that the managing officers knew what to expect from similar situations and could prepare accordingly. Thus, there is no evidence that the Miami Police Department did not prepare its commanders for the protest.

Mr. Danaher's fourth opinion – that the City handled the protest poorly – is over broad. In his declaration, Mr. Danaher contends in various ways that the Miami Police Department did not respond appropriately to the protest. For example, Mr. Danaher asserts that "by using force too precipitously and aggressively against the crowd by jabbing striking, and cross checking the crowd with the 36 inch batons, the Miami Police Department increased the level of anxiety, tension and frustration among both the crowd and its own policy force. This is the opposite of what proper police practice calls for." (Declaration of Mr. Danaher ¶ 66.) Further, Mr. Danaher contends that "[t]he Miami Police Department's reckless conduct demonstrated a failure to make reasonable judgments as to when, why, and what type of force should be used" and that "Miami Police Department's use of force tactics were not proportionate to the threat." *Id.* at ¶ 73, 75. Mr. Danaher's numerous declarations still do not allege that the Miami Police Department's failure to control the protest was due to a deliberate indifference to the rights of the protestors or that the Miami Police Department made a deliberate choice not to use more appropriate tactics. Mr. Danaher's assertions do not assist the trier of fact in its determination of municipal liability.

Nonetheless, even though the City could not prepare for every contingency and institute a policy that would ensure no officer would ever violate his training, the City did

38

take deliberate steps to follow proper police practice. As discussed above, the Miami

Police Department established a Steering Committee to prepare the training, logistics, and

operations for the FTAA protest. The Steering Committee then brought in CRA to

provide several training classes: officers underwent bike and mass arrest training courses,

were trained on the batons one day a week for about two months, were all given the same

"force continuum," and the officers in charge of decision making at the protest attended a

forty (40) hour command course. Plaintiff has no evidence that not only did the City

adopt an inadequate training policy, it did so knowing the policy was inadequate, but was

indifferent to its inadequacy.

### b) Plaintiff's Reliance on the Department of Justice's Committee Report

The Plaintiff argues that the City was put on notice  that these policies were

inadequate prior to the FTAA protest because during the "Elian" demonstrations in 2000,

the City of Miami appointed a city committee to analyze the Miami Police Department's

response to the protests.[5] This committee issued a report in September 2000 stating that

"[m]any officers were left without guidance and acted individually and too often

inconsistently with their brethren. So called 'rules of engagement' were not clearly stated

---

[5] Plaintiff also claims that the City was put on notice because of the investigation that the United States Department of Justice conducted into the Miami Police department and its use of force policy in early 2003, and a letter it wrote a letter to the City in March 2003, stating that the Miami Police Department is "not consistent in its definition of appropriate use of force" and "in other places in the [departmental orders] the definition of use of force does not meet constitutional requirements." However, the City did not ignore this issue. On October 3, 2003, Chief Timoney put a revised policy into effect dealing with the issues identified by the DOJ. (Pl.'s Ex. "B" at 13.)

for field force commanders or their subordinates... On multiple occasions variable police actions contributed to and exacerbated crowd reactions to a police presence... There should be a well defined continuum of force or criteria delineating the permissible level of force to employ in handling and dispersing the crowds or arresting lawbreakers." (Department of Justice's Committee Report.) Plaintiff cannot depend on one committee report about a demonstration that happened years earlier, in light of all the rigorous training the City of Miami gave its police officers. The Committee report mentioned isolated incidents of excessive force. To say that such a committee report establishes the kind of evidence of a widespread unconstitutional practice the Plaintiff needs to present would be to undo the holding of *Gold v. City of Miami*.

Plaintiff's reliance on one report detailing criticisms of the City of Miami's handling of protest situations is misplaced. The aftermath of the Elian Gonzalez demonstrations, rather than helping Plaintiff establish what he needs in order to carry his heavy burden under *Gold* and *Monell* for municipal liability, actually only serve to further exonerate the City from liability. In a case strikingly similar to this one, which the Defendant included in this record as Exhibit "K," the City was exonerated in the civil lawsuit arising from the Elian Gonzalez incidents. United States Southern District Judge Alan S. Gold, in an unpublished opinion (affirmed by the Eleventh Circuit in another unpublished opinion), granted the City of Miami's motion for summary judgment in *Ybarra v. City of Miami*, 02-20972-CIV-GOLD.

In the *Ybarra* case, Plaintiff brought an action under 42 U.S.C. § 1983 against the

40

City of Miami and one of its police officers. Ybarra alleged that Defendants arrested her in violation of the First and Fourth Amendments of the Constitution, and that excessive force was used. With the exception of the fact that the Plaintiff was able to identify her alleged assailants, the facts are very similar to the instant case. On April 22, 2000, demonstrations in reaction to the seizure of Elian Gonzalez began to break out in Miami. Plaintiff Ybarra, an immigration attorney, stated that she was standing on a public street in Miami, raising money to bond out demonstrators from passing cars, when the police interrupted her lawful assembly, arrested her, sprayed her with a liquid chemical, threw her to the ground, dragged and handcuffed her, and then denied her immediate medical treatment. (Def.'s Ex. "K" at 3.) Ybarra was attempting to establish municipal liability, not just liability against the police officers she alleged had violated her constitutional rights, and she alleged that the City "permitted, tolerated and caused a pattern of practice of [*sic*] unjustified, unreasonable, and illegal use of force against members of the public by police officers of the Defendant, City of Miami, as well as unconstitutional intrusion on the First Amendment rights of Public citizens." *Id.* at 11. In a manner very similar to the instant Plaintiff Owaki, to prove the standard of a custom or practice established by through the repeated acts of a final policy, Ybarra introduced an expert witness report from a police expert witness, and an ad hoc report from a Miami Departmental Review Committee.

Judge Gold found such evidence inadequate to establish municipal liability: He stated that "[r]egarding the ad hoc report, municipalities routinely employ review

committees to review and make suggestions for improvement of city services." *Id.* at 16. The ad hoc committee was appointed to investigate "police-community relations in the aftermath of the Elian Gonzalez, and did not focus on the question of whether a city-wide policy or custom existed that was responsible for violations of constitutional rights." *Id.* He concluded that the committee's finding that in several instances the police behaved inappropriately does not support a claim of municipal liability. *Id.* In an unpublished opinion affirming the summary judgment for the City of Miami, the Eleventh Circuit held:[6] "[f]irst, as to the expert opinion, an expert's conclusory testimony without evidence of any prior incidents is insufficient to place the municipality on notice of the need to train." *Ybarra v. City of Miami*, Appeal No. 03-14660 at 15. The Eleventh Circuit also rejected the Ad Hoc Committee Report as notice of police officer misconduct "because the report was prepared and issued after Ybarra's arrest." *Id.*

## IV. CONCLUSION

The uncontradicted facts show that on the morning of the protest, the officers lawfully arrested Plaintiff in an attempt to restore order to an increasingly chaotic situation. While the officers were attempting to gain control of the crowd, an unidentified police officer struck Plaintiff with excessive force. However, Plaintiff is unable to show that any of the supervisors on the scene could have prevented Plaintiff's

---

[6] This Court recognizes the limited precedential effect of non published Circuit Opinions, but finds the language of this opinion instructive. *See U.S. v. Rodriguez-Lopez*, 363 F. 3d 1134, 1138 (11th Cir. 2004) ("While unpublished opinions are not binding on this court, they may nonetheless be cited as persuasive authority.")

injury.

Further, Plaintiff failed to demonstrate that the City of Miami is liable under 42

U.S.C. § 1983 for a failure to train its officers. The City's training for the FTAA protest

was extensive. There is no evidence that the City did not make a faithful effort to

minimize potential constitutional violations in its training. Finally, Plaintiff's claim under

the state tort of battery is barred by Plaintiff's participation in the riot. It is, therefore,

It is, therefore, ORDERED, ADJUDGED and DECREED that Defendants'

Motions for Summary Judgment[7] be, and the same are hereby GRANTED.

DONE AND ORDERED in chambers at the James Lawrence King Federal Justice

Building and United States Courthouse, Miami, Florida, this 21st day of June, 2007.


JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF FLORIDA

---

[7]   D.E. #'s 64, 65 and 66.

Copies furnished to:
John De Leon, Esq.
Raymond J. Taseff, Esq.
Chavez & De Leon
5975 Sunset Drive
Suite 605
South Miami, FL 33143

Elizabeth M. Iglesias, Esq.
Iglesias Law Firm PL
University of Miami School of Law
1311 Miller Drive
Suite 269G
Coral Gables, FL 33146
*Counsel for Plaintiff*

Warren Bittner, Esq.
Miami City Attorney's Office
Miami Riverside Center
444 SW 2nd Avenue
Suite 945
Miami, FL 33130-1910

Beverly A. Pohl, Esq.
Broad and Cassel
100 SE 3rd Avenue
Suite 2700 One Financial Plaza
Fort Lauderdale, FL 33394

Jeffrey Paul Ehrlich, Esq.
Dade County Attorney's Office
Metro Dade Center
111 NW 1st Street
Suite 2810
Miami, FL 33128-1993
*Counsel for Defendants*